# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

JOSHUA L. BROWN,

               **Plaintiff,**

      **v.**                            **Case No. 23-CV-1327**

CITY OF RACINE, et al.,

               **Defendants.**

## DECISION AND ORDER

### 1. Introduction

Defendants City of Racine, Juan Garcia, David Arvai, Michael Riemer, and Jeffrey Nikolai have filed a motion for summary judgment. (ECF No. 23.) All parties have consented to the full jurisdiction of this Court pursuant to 28 U.S.C. § 636(c). (ECF Nos. 14, 15.) Defendants' motion for summary judgment is ready for resolution.

Plaintiff Joshua Brown brings claims under 42 U.S.C. § 1983 against the defendants for excessive force and failure to intervene relating to handcuffing. (ECF No. 1.) In response to Defendants' summary judgment motion he agrees that summary judgment is proper as to defendants Arvai and Riemer. (ECF No. 28 at 1.) He also abandons his theory that the defendants violated his constitutional rights by denying him medical care

for his diabetes. (*Id.*) The City of Racine remains on this case only for indemnification purposes under Wisconsin law (ECF No. 1, ¶ 8; ECF No. 22; ECF No. 28 at 17-21), which Defendants argue is improper (ECF No. 32 at 10-12).

## 2. Facts

The following facts are taken largely from Defendants' Statement of Proposed Material Facts (ECF No. 24-3) and Plaintiff's Proposed Additional Facts (ECF No. 26). Unless otherwise noted, the facts are undisputed. The Court reads all reasonable inferences in favor of Brown as the non-moving party.

On October 7, 2020, Brown called 911 to report that a guest in his home might be overdosing. (ECF No. 26, ¶ 10.) Emergency medical personnel and police officers Arvai and Reimer arrived at the home at around 2:06 pm. (ECF No. 24-3, ¶ 10.) Arvai and Reimer spoke with Brown to try to understand what happened. (*Id.*, ¶ 11.) Brown was "in the kitchen area and was frantic." (*Id.*, ¶ 12.) He told the officers about the overdose victim and the events leading up to the officers' arrival at the scene. (*Id.*, ¶ 13; ECF No. 24, Ex. 4 at 6:38-12:00, 19:45-22:10.)

Brown was wandering around his kitchen and, at one point, picked items up off the floor and put them in a nearby trash can. (ECF No. 24-3, ¶ 16; ECF No. 24, Ex. 4 at 9:30-9:40.) Arvai asked Brown to stop cleaning things up and Brown complied. (ECF No. 24-3, ¶ 17; ECF No. 24, Ex. 4 at 9:40-9:47.) Arvai then looked at the open garbage can and saw "numerous torn corners of plastic items" and "aluminum foil, some balled up and

some shredded, in and around the garbage can"—items he associated with drug dealing. (ECF No. 24-3, ¶¶ 18-19.) When Arvai asked Brown if he would consent to a search of the garbage can, Brown consented. (*Id.*, ¶¶ 23-24.) Arvai found numerous knotted baggie corners, complete baggies, and a baggie wrapped in black electrical tape, with one baggie containing brown residue—items Arvai also associated with drug dealing. (*Id.*, ¶¶ 25-26.)

Meanwhile, Reimer assisted medical personnel with the victim. (ECF No. 24-3, ¶ 20.) Reimer found a digital scale with a white powdery substance on it and pieces of a burnt Chore Boy style scrubber—items which he associated with the use of illegal narcotics. (*Id.*, ¶¶ 21-22.)[1] Emergency medical technicians ultimately saved the overdosing individual and took her to a hospital. (ECF No. 26, ¶ 12.)

Arvai learned that Brown was on both state and federal supervision. (ECF No. 24-3, ¶ 28.) At 2:40 pm, a little over a half hour after the officers arrived, Arvai detained Brown and put him in handcuffs due to the presence of drug paraphernalia and a suspicion that firearms would be present. (*Id.*, ¶¶ 29-30; ECF No. 24, Ex. 4 at 39:25-39:45.) Brown did not resist the handcuffs being put on. (ECF No. 26, ¶ 14.) During the entire time Brown was handcuffed, he never physically resisted anyone, threatened anyone, or tried to flee. (*Id.*, ¶ 15.)

---

[1] Defendants state that there were also baggies in the toilet. (ECF No. 24-3, ¶ 27.) The bodycam footage shows that, after Reimer supposedly identified baggies in the toilet, defendant then-Sergeant Garcia arrived and pointed out it was just toilet paper. (ECF No. 24, Ex. 5 at 4:25-4:35.)

Reimer requested that a supervisor and investigator respond to the scene so they could perform a thorough analysis and investigation. (ECF No. 24-3, ¶ 33.) Just before 3:00 pm then-Sergeant Garcia arrived at the scene as a supervisor along with Investigator Nuttall. (*Id.*, ¶ 34; ECF No. 26, ¶ 16.) At about 3:10 pm Nikolai arrived as an Evidence Technician, charged with photographing and logging potential evidence. (ECF No. 24-3, ¶ 35; ECF No. 26, ¶ 17.) Nuttal determined that a search warrant was necessary and left to draft the warrant. (ECF No. 24-3, ¶ 36.)

While Brown was detained he repeatedly informed the officers that he wanted to "work for them," meaning that he was willing to be an informant if they did not charge him with certain crimes. (ECF No. 24-3, ¶ 37.) The officers told Brown he needed to speak to Nuttal about being an informant and that the other officers could not make that decision. (*Id.*, ¶ 38.) At 3:45 pm Garcia told Brown it would likely take an hour to an hour and a half for Nuttal to draft the search warrant and have it signed by a judge. (*Id.*, ¶ 39.)

At around 3:40 pm, after Brown had been in handcuffs for about an hour, he asked to be handcuffed in front so he could answer a video-call and not appear to be under arrest. (ECF No. 24-3, ¶ 41; ECF No. 24, Ex. B at 50:25-50:40.) Garcia told Brown he could not wear the handcuffs in front. (ECF No. 24, Ex. B at 50:25-50:40.)

Brown contends that Racine Police Department officers are permitted to handcuff suspects in front of their bodies during long transportations and in cases of emergency. (ECF No. 26, ¶ 18.) Racine Police Department officers are also allowed to double-handcuff

4

a suspect or arrestee at their discretion, and all Racine police officers carry two sets of handcuffs. (*Id.,* ¶¶ 20-21.) Double handcuffing is handcuffing two sets of handcuffs together, which doubles the length of the handcuffs and creates more slack. (*Id.,* ¶ 22.) Garcia testified that, if someone complains about handcuffs, an officer can first loosen the handcuffs and, if the person complains again, apply double handcuffs. (*Id.,* ¶ 23.)

At 4:09 pm, about an hour after Garcia arrived, Brown asked Garcia if he could be handcuffed to something because his shoulder was "fucked up." (ECF No. 26, ¶ 25.) Garcia told him he had to be handcuffed behind the back and that the department does not handcuff people in the front. (*Id.,* ¶ 26.) Brown then said that he had been in handcuffs for over two hours (it had been about an hour and a half). (*Id.,* ¶ 27.) Garcia understood Brown to be telling him he was in pain. (*Id.,* ¶ 28.) Nikolai was present during this interaction. (*Id.,* ¶ 29.) Nikolai also understood Brown to mean that there was something wrong with his shoulder or that it was in pain. (*Id.,* ¶ 30.)

A few minutes later, at about 4:17 pm, Brown said to Garcia, "This shit is hurting me, man …. I'm dead serious; my fucking shoulder and my motherfucking wrist is killing me, man. I been sitting here …." (ECF No. 26, ¶ 31.) Garcia offered to loosen the handcuffs but said he could not take them off. (*Id.,* ¶ 32.) Brown responded, "I'm not telling you to take them off, I'm just telling you—is there any type of way you can adjust them? Like, goddamn, like this shit …" (*Id.,* ¶ 33.)

Garcia interrupted to ask, "Are your hands back-to-back like that?" (ECF No. 26, ¶ 34.) Garcia checked the handcuffs for appropriate fit, noted there was some slack on the left, and loosened the right. (ECF No. 24-3, ¶ 44; ECF No. 26, ¶ 35.) He told Brown that he could loosen the cuffs but "that's all [he] can do." (ECF No. 26, ¶ 36.) Brown again suggested he was in pain, to which Garcia said, "I believe you, man, but I can't take them off, again." (*Id.*, ¶ 38.) Garcia testified that this comment was just to build rapport with Brown. (*Id.*, ¶ 39.) After Garcia adjusted the handcuffs, he told Brown, "There, that's a lot looser now." (*Id.*, ¶ 40; ECF No. 24, Ex. 6 at 16:02-16:09.) Nikolai was present during this interaction. (ECF No. 26, ¶ 41.)

A little less than a half hour later, at about 4:43 pm, the following exchange took place:

[Brown winces]

Brown: Man, is this regular, man, for someone to be in handcuffs for three hours?

Garcia: I've seen people handcuffed longer, man. Until they get that search warrant.

Brown: Shit.

Garcia: If you want, I can call [Nuttal] up, and we can just call your agent and put the [probation] hold on you right away and say, "Hey," [and] take you down to the county jail.

Brown: Bro, I'm not trying to be an asshole, I just—

Garcia: I'm just letting you know. I mean, those are your options.

> Brown: 99% of the time, I'm just saying, I'm gone on a [probation officer] hold, anyway. Ya'll are going to cop to my agent. I'm just saying … Bro, I swear to God my shit hurting, bro. I'm not trying to be an a—
>
> Garcia: I'm not telling you. I'm not doubting that it is, man, because handcuffs aren't comfortable, they're not built for comfort. But I'm letting you know, I've already loosened them up. I can't do anything else for you. We don't [] handcuff people in front, man. It's against our policy. Our policy is to have people handcuffed behind the back.

(ECF No. 26, ¶ 42 (quoting ECF No. 24, Ex. 6 at 41:05-41:21).) They then discussed whether people who are detained are always handcuffed. (ECF No. 24-3, ¶ 49.) Defendants point to this interaction to show that Garcia offered to take Brown to jail and remove his handcuffs. (*Id.*, ¶¶ 48-49.) Nikolai was present during the interaction. (ECF No. 26, ¶ 46.) Garcia testified that, when he said he believed Brown was in pain, he was building rapport and was not sure whether Brown was in pain or trying to ambush him. (*Id.*, ¶¶ 43, 44.)

Almost ten minutes later, at about 4:51 pm, Brown asked if he had to sit, to which Garcia responded by telling Brown he could stand and stretch. (ECF No. 24-3, ¶ 50; ECF No. 24, Ex. 6 at 48:30-49:00.) Brown asked if he could stand for a bit and again referenced his shoulder, to which Garcia said, "Go ahead." (ECF No. 24, Ex.6 at 48:30-49:00.)

7

At about 5:40 pm, officers arrived on scene to execute a signed search warrant. (ECF No. 24-3, ¶ 52.) The officers executed the warrant and found a loaded firearm.[2] (*Id.*, ¶ 54.)

An officer read Brown his *Miranda* rights and Brown said he understood. (ECF No. 24-3, ¶ 55.) The officer followed up, "You hurt at all, you injured at all, you okay?"—to which Brown said his shoulder hurt, but he was okay. (*Id.*, ¶ 55.)

At about 6:35 pm, Brown told Garcia he had been in handcuffs since 2:00 pm (it had actually been since 2:40 pm) and said, "If I did have a football career it's over. This is it. I can't throw again ever in my life." (ECF No. 26, ¶¶ 47-48.) Garcia claims he did not understand Brown to be complaining about his shoulder. (*Id.*, ¶ 49.) Nikolai was present during this interaction. (*Id.*, ¶ 50.)

Brown contends that at around 6:45 pm Garcia saw him wince in pain. (ECF No. 26, ¶ 51.) When reviewing the bodycam video, Garcia agreed that Brown winced, although it is unclear whether Garcia concedes that he saw Brown wince on October 7 or just when he reviewed the video. (*Id.*, ¶ 52.)

Garcia left Brown's home at about 6:47 pm. (ECF No. 26, ¶ 53.) He knew by the time he left that Brown had been in handcuffs for at least 3 hours and 45 minutes. (*Id.*, ¶ 58.) He did not tell anyone that Brown had been complaining about his shoulder. (*Id.*,

---

[2] Defendants contend that the officers also found large quantities of drugs, but Brown disputes this because the cited evidence field-tested negative for drugs. (ECF No. 27, ¶ 53.)

¶ 54.) Garcia never told Brown he could be double cuffed. (*Id.*, ¶ 56.) In fact, when he told Brown there was nothing anyone could do beyond loosening cuffs, he meant that double cuffing was not an option. (*Id.*, ¶ 57.) Nikolai left at around 6:46 pm. (*Id.*, ¶ 59.) The parties do not indicate at what time the officers removed the handcuffs from Brown.

Garcia has since admitted he could have used double handcuffs on Brown at any time. (ECF No. 26, ¶ 60.) Nikolai admitted it would have been easy and taken less than a minute to switch Brown from single to double handcuffs. (*Id.*, ¶ 62.) When asked whether it would have been safe to do so, Nikolai testified that "[i]t probably wouldn't have made much of a difference." (*Id.*, ¶ 63.) Nikolai also admitted that, although he could have walked over and put Brown in double handcuffs, he would have had to override his superior officer, Garcia. (*Id.*, ¶ 64.)

Brown contends he has ongoing shoulder pain and requires physical therapy due to the handcuffing. (ECF No. 26, ¶ 65.) He suggests the following conditions are related to the handcuffing: muscle weakness, limited range of motion, pain limiting function in his shoulder, and a mildly curved shoulder blade. (*Id.*, ¶¶ 66-67.)

### 3. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it "might affect the outcome of the suit" and a dispute is "genuine" only if a reasonable factfinder could return a verdict

for the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). In resolving a motion for summary judgment, the court is to "construe all evidence and draw all reasonable inferences from the evidence in" favor of the non-movant. *E.Y. v. United States*, 758 F.3d 861, 863 (7th Cir. 2014) (citing *Gil v. Reed*, 535 F.3d 551, 556 (7th Cir. 2008); *Del Raso v. United States*, 244 F.3d 567, 570 (7th Cir. 2001)). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and [in] opposition to the motion for summary judgment." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016).

## 4. Analysis

### 4.1 Excessive Force

Brown argues that Garcia and Nikolai acted unreasonably by knowingly causing him unnecessary pain, and that "a jury could infer that Garcia and Nikolai knew that the handcuffs were causing Brown shoulder pain" because of his four-hour detention, his repeated statements that he was in pain, and witnessing him wince in pain. (ECF No. 28 at 10, 13-16.) He contends that his pain was unnecessary because he "presented no threat of flight or fight" and it would have been easy for Garcia or Nikolai to alleviate his pain. (ECF No. 28 at 11-13.)

"All claims that law enforcement officers have used excessive force in the course of an arrest, investigatory stop, or other seizure are analyzed under the Fourth Amendment and its 'reasonableness' standard." *Sow v. Fortville Police Dep't*, 636 F.3d 293, 303 (7th Cir. 2011) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). "Reasonableness" lacks precise definition but requires a balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Abbott v. Sangamon Cnty.*, 705 F.3d 706, 724 (7th Cir. 2013) (quoting *Scott v. Harris*, 550 U.S. 372, 383 (2007)). Relevant factors include "the severity of the crime, whether the arrestee poses an immediate threat to the safety of the officers or others, and whether he or she is actively resisting arrest or attempting to flee and evade arrest." *Id*. "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Tibbs v. City of Chicago*, 469 F.3d 661, 665 (7th Cir. 2006) (quoting *Graham*, 480 U.S. at 397).

Reasonableness is assessed from "the perspective 'of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Plumhoff v. Rickard*, 572 U.S. 765, 775 (2014) (quoting *Graham*, 490 U.S. at 396). Police officers are given "considerable leeway" with respect to their assessments as to the appropriate amount of force to use in a particular situation. *Abbott*, 705 F.3d at 724 (quoting *Baird v. Renbarger*, 576 F.3d 340, 344 (7th Cir. 2009)). Not every use of force, "'even if it may later seem unnecessary in the

peace of a judge's chambers' violates the Fourth Amendment." *Graham*, 490 U.S. at 396

(quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).

Overly tight or painful handcuffs can give rise to an excessive force violation. *Tibbs*,

469 F.3d at 666. One instance where an officer's acts may be unreasonable is where he

"knowingly use[s] handcuffs in a way that will inflict unnecessary pain or injury on an

individual who presents little or no risk of flight or threat of injury.'" *Rabin v. Flynn*, 725

F.3d 628, 636 (2013) (quoting *Stainback v. Dixon*, 569 F.3d 767, 772 (7th Cir. 2009)). In such

a case, "the key fact is that the officer must *know* the handcuffs will cause unnecessary

pain or injury." *Day v. Wooten*, 947 F.3d 453, 462 (7th Cir. 2020) (emphasis added).

"Of course, whether an officer knows that a given action unnecessarily will harm

a particular individual will depend upon the circumstances of the arrest. In some cases,

the fact that an act will cause pain or injury will be clear from the nature of the act itself."

*Stainback*, 569 F.3d at 772 (citing *Payne v. Pauley*, 337 F.3d 767, 779 (7th Cir. 2003)). "In

other cases, it may become clear to an arresting officer that, although a particular action

would not ordinarily harm an arrestee, the action would nevertheless cause pain or injury

to the particular individual being placed under arrest. For example, an officer's otherwise

reasonable conduct may be objectively unreasonable when the officer knows of an

arrestee's medical problems." *Stainback*, 569 F.3d at 772.

The Seventh Circuit Court of Appeals has emphasized the importance of "multiple and specific complaints by the arrestee about the nature of his pain or injury." *Day*, 947 F.3d at 462 (citing *Rooni v. Biser*, 742 F.3d 737, 742-43 (7th Cir. 2014)). One or two generalized complaints that handcuffs are too tight is generally not enough. *See, e.g., Sow*, 636 F.3d at 304 (noting plaintiff complained once, presented no evidence he elaborated on the pain, and did not complain of any injury or receive any treatment when he was taken to jail); *Tibbs*, 469 F.3d at 663-66 (noting plaintiff complained twice, and only once to the arresting officer, "without elaborating on any injury, numbness, or degree of pain" and did not seek or receive medical care).

In *Rabin v. Flynn*, 725 F.3d 628, 636 (7th Cir. 2013), the plaintiff proffered enough evidence to create a fact issue on excessive force where he "directly told [the officer] about his 'bad neck' and 'bad hand in the past' and that the handcuffs were overly tight, and it was undisputed that [he] was cooperative the entire time." *See also Watts v. McSherry*, No. 12-cv-137, 2013 WL 5498254, at *6 (N.D. Ind. Oct. 2, 2013) (finding plaintiff's repeated complaints about being handcuffed behind the back and mentioning he had shoulder surgery were sufficiently specific to require the officers to consider whether it was appropriate to handcuff him).

Brown proffered evidence that the officers may have known of his pain because he made multiple complaints of pain that he linked to his shoulder and the length of his detention. He asked Garcia if he could be handcuffed to something because his shoulder

was "fucked up." (ECF No. 33, ¶ 25.) He said to Garcia, "This shit is hurting me, man ….

I'm dead serious; my fucking shoulder and my motherfucking wrist is killing me, man. I

been sitting here …." (*Id.*, ¶ 31), and "I'm not telling you to take them off, I'm just telling

you—is there any type of way you can adjust them? Like, goddamn, like this shit …" (*Id.*,

¶ 33). Officers Garcia and Nikolai testified that they understood Brown to be saying he

was in pain. (*Id.*, ¶¶ 28, 30.)

After Garcia loosened Brown's handcuffs, Brown said to Garcia, "I'm not trying to

be an asshole, I just … I'm just saying … Bro, I swear to God my shit hurting, bro. I'm not

trying to be an a—." (ECF No. 33, ¶¶ 38, 42.) After about four hours in handcuffs, Brown

told Garcia he had been in handcuffs since 2:00 pm (it had been since 2:40 pm) and said,

"[i]f I did have a football career it's over. This is it. I can't throw again ever in my life."

(*Id.*, ¶¶ 47, 48.) Brown also contends Garcia saw him wince in pain. (*Id.*, ¶ 51). Nikolai

was present throughout these interactions. (*Id.*, ¶¶ 29, 41, 46, 50.) Based on this evidence,

a reasonable jury could find that officers Garcia and Nikolai knew that Brown was in pain

from the handcuffs.

The reasonableness analysis also considers the crime for which the plaintiff was

being investigated and the risk of flight and threat of injury he posed. *See Watts*, 2013 WL

5498254, at *4 (discussing caselaw). The officers detained Brown for suspected drug

dealing. Courts routinely recognize the risk of danger associated with those suspected of

drug dealing, as "it is widely known that guns and drugs go hand in hand." *United States*

*v. Gulley*, 722 F.3d 901, 909 (7th Cir. 2013); *see also United States v. Askew*, 403 F.3d 496, 507 (7th Cir. 2005).

However, Brown proffered evidence that he was cooperative during the entire multi-hour detention and presented no risk of flight or threat of violence. (ECF No. 28 at 11.) Furthermore, Brown proffered evidence that officers Garcia and Nikolai could have easily lessened his pain by double handcuffing him and that Nikolai testified "[i]t probably wouldn't have made much of a difference" to the officers' safety to do so. (ECF No. 33 at ¶¶ 60-63.)

The extent of a plaintiff's injuries can be evidence of excessive force, or lack thereof, from overly tight handcuffs. *See Outlaw v. Newkirk*, 259 F.3d 833 (7th Cir. 2001) (noting that de minimis injuries suggested the force used was de minimis); *Tibbs*, 469 F.3d at 666 (rejecting excessive force claim in part because of the plaintiff's minor injuries and lack of medical treatment). Brown proffered evidence that he suffered injuries from the handcuffing: he has ongoing shoulder pain and requires physical therapy, he has muscle weakness, limited range of motion, and pain limiting function in his shoulder, and he has a mildly curved shoulder blade. (ECF No. 33, ¶¶ 65-67.)

The length of the detention can also be a factor in the reasonableness analysis. *E.g.*, *Rabin*, 725 F.3d at 642-43 (Rovner, J., concurring) (criticizing a 90-minute handcuffing in excessive force claim of a plaintiff who was stopped while police investigated whether he was authorized to have a firearm); *Heitschmidt v. City of Houston*, 161 F.3d 834, 838-40 (5th

Cir. 1998) (denying motion to dismiss excessive force claim because placing the plaintiff, who was not a target of the investigation and did not attempt to flee, in tight handcuffs for four and a half hours was not objectively reasonable); *Sebastian v. Ortiz*, 918 F.3d 1301, 1309-11 (11th Cir. 2019) (finding excessive force where officers used tight handcuffs on the plaintiff for five hours during a traffic stop arrest).

On this record, a reasonable jury could find that it was unreasonable to leave Brown in single handcuffs behind the back for four hours, notwithstanding Brown's complaints of shoulder pain from the handcuffs and considering Brown's cooperative nature.

Garcia's status as Nikolai's supervisor does not shield Nikolai from a potential excessive force violation. A bystander "can be held liable under § 1983 if [he] (1) had reason to know that a fellow officer was using excessive force ... and (2) had a realistic opportunity to prevent the act from occurring." *Lewis v. Downey*, 581 F.3d 467, 472 (7th Cir. 2009) (alterations in original); *Sanchez v. City of Chicago*, 700 F.3d 919, 926 (7th Cir. 2012); *see, e.g.*, *Lewis*, 581 F.3d at 472 (finding the bystander officer had no realistic opportunity to prevent the act from occurring where the act was an almost instantaneous discharge of a taser gun). Brown contends that Nikolai was present throughout the relevant interactions and testified that he could have used double handcuffs. (ECF No. 28 at 16.) Thus, Nikolai can be held liable under § 1983 if a jury finds he acted unreasonably in not intervening to adjust Brown's handcuffs.

Thus, a genuine material dispute of fact exists as to whether officers Garcia and Nikolai violated Brown's Fourth Amendment rights.

## 4.2 Qualified Immunity

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "An official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was 'clearly established' at the time of the challenged conduct." *Plumhoff*, 572 U.S. at 778 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). "And a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it. In other words, 'existing precedent must have placed the statutory or constitutional question' confronted by the official 'beyond debate.'" *Id.* at 778-79 (quoting *Ashcroft*, 563 U.S. at 741). "This exacting standard 'gives government officials breathing room to make reasonable but mistaken judgments' by 'protecting all but the plainly incompetent or those who knowingly violate the law.'" *City & Cty. of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015) (brackets omitted) (quoting *Ashcroft*, 563 U.S. at 743).

"'[C]learly established law' should not be defined 'at a high level of generality.'" *White v. Pauly*, 580 U.S. 73, 79 (2017) (quoting *Ashcroft*, 563 U.S. at 742). "[T]he clearly established law must be 'particularized' to the facts of the case." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). This requires the plaintiff to point to a case where an officer acting under similar circumstances as the defendants was held to have violated the Fourth Amendment. *Id.*

Brown contends that the relevant clearly established law is the principle that an officer may not knowingly cause unnecessary pain or injury. (ECF No. 28 at 9-10); *see also Rooni*, 742 F.3d at 742 ("A person has the right to be free from an officer's knowing use of handcuffs in a way that would inflict unnecessary pain or injury, if that person presents little or no risk of flight or threat of injury."). Although that principle is undoubtedly clearly established, for the purposes of the present action it defines the right at too high of a level of generality.

Brown's framing of the clearly established law amounts to little more than a recounting of the principle that police officers may not employ handcuffs unreasonably so as to violate the Fourth Amendment. *Cf. Day*, 947 F.3d at 461 ("To defeat qualified immunity, however, the right must be defined more specifically than simply the general right to be free from unreasonable seizure."); *see also Mullenix v. Luna*, 577 U.S. 7, 13 (2015) (rejecting a similarly "general" qualified immunity test and stating that "[t]he correct inquiry … [is] whether it was clearly established that the Fourth Amendment prohibited

the officer's conduct in *the 'situation she confronted'*" (brackets omitted) (emphasis added) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004))).

For example, although it is well-established that a police officer violates the Fourth Amendment if he uses unreasonable force in detaining a person, a plaintiff does not overcome qualified immunity merely by showing that the officer used unreasonable force. To overcome qualified immunity, the plaintiff must point to a case that gives an officer "'fair and clear warning' of what the Constitution requires." *Ashcroft*, 563 U.S. at 746 (Kennedy, J., concurring) (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)). This requires more than merely alerting the officers that their actions may give rise to a constitutional claim. Rather, there must be a case that both defines the line and shows any reasonable officer in the defendants' position that they are on the wrong side of it.

Qualified immunity is generally a fact-intensive analysis. Here, Garcia and Nikolai were at Brown's home because a guest had overdosed there and officers saw in plain view evidence of both drug use and drug dealing. These circumstances led the officers to get a search warrant. Brown was cooperative, the interactions between him and the officers were cordial, and in fact he offered to work with the officers as an informant. However, Brown was on both state and federal supervision.

These circumstances led the officers to cuff Brown while they waited for a warrant. After nearly 90 minutes of Brown sitting with his hands cuffed behind his back, he commented about his shoulder being "fucked up." About ten minutes later he commented on his wrist and shoulder hurting, which led Garcia to check the cuffs and loosen one. About 20 minutes later, Brown complained again about the cuffs, at which point Garcia offered to take him to jail, where the cuffs would be removed. Brown declined. A little while later, when he asked to stretch, Garcia invited him to stand up, and Brown did so. Over an hour later Brown commented about his football career being over and a bit later he visibly winced.

Nothing in these facts would have informed the defendants that they were "knowingly violating the law" such that they are not entitled to qualified immunity. *See Sheehan*, 575 U.S. at 611 (quoting *Ashcroft*, 563 U.S. at 743). Brown has not, for example, pointed to any authority clearly establishing a maximum amount of time a person—even a cordial and cooperative person who poses no apparent threat to flee—can be handcuffed. Nor is there any authority clearly establishing that officers must uncuff a person after he complains a certain number of times or makes any particular sort of complaint. These are all factors, but when considered both individually and collectively, the facts of this case would not lead a reasonable officer in Garcia's or Nikolai's position to know their actions violated the Constitution.

Much of the caselaw addressing excessive force vis-à-vis the use of handcuffs involves allegations that the handcuffs were applied too tightly. *See, e.g.*, *Rooni*, 742 F.3d at 740 (discussing handcuffing that resulted in "blood and blister-type discoloration under [the plaintiff's] skin, his hands were numb and painful, and his fingers were swollen for a few days"); *Payne*, 337 F.3d at 774-75 ("Eventually [the officer] grabbed [the plaintiff's] left arm, jerked it into handcuffing position, forced her arm behind her back, slammed the handcuff down on her wrist, jerked her wrist, and tightened the handcuffs until [she] could not feel her hands. [She] protested that the handcuffs were too tight, that she could not feel her hands, and that she was in pain ...."); *Herzog v. Winnetka*, 309 F.3d 1041, 1043 (7th Cir. 2002) ("[W]ithout provocation or excuse [one officer] shoved the middle-aged female plaintiff to the ground and [the other officer] refused to loosen the plaintiff's chafing handcuffs."). But here, when Brown complained that his cuffs were too tight, the defendants immediately loosened them, after which Brown never again complained about the handcuffs being too tight.

This case falls into a different category of Fourth Amendment handcuffing cases—where the allegation is that the mere fact of handcuffing caused the injury, generally because of a pre-existing condition that made it injurious or painful to be handcuffed behind the back. Perhaps the most analogous case is *Stainback v. Dixon*, 569 F.3d 767 (7th Cir. 2009). In that case, when officers told Stainback he was under arrest for a traffic warrant, Stainback asked that they not handcuff him because he was concerned that he

would be hurt. *Stainback*, 569 F.3d at 769. Officers handcuffed him anyway and put him in a squad car, where he complained that the handcuffs were hurting his shoulders and again asked that the officers remove the cuffs. *Id.* An officer responded that the cuffs would be removed in a few minutes. During the up to three-minute drive to the police station Stainback again asked that the cuffs be removed, but the officer did not do so. *Id.* In total, he was in handcuffs for up to 20 minutes. *Id.* Stainbeck alleged that he suffered a torn rotator cuff and required surgery as a result. *Id.*

Similarly, although Brown told Garcia and Nikolai that his shoulder was "fucked up," it was unclear if he was referring to a pre-existing injury or describing the discomfort he felt as a result of being handcuffed. This sort of vague statement did not make it unconstitutional for Brown to be handcuffed behind his back. *See Stainback*, 569 F.3d at 773 ("[I]t was not objectively clear to the Officers that Mr. Stainback suffered from any infirmities, nor did Mr. Stainback inform the Officers that he had a preexisting injury or condition that would be aggravated if he were handcuffed." (citation omitted)).

Similar to Stainback, where in response to Stainback's complaints the officers told him that the handcuffs would be removed in a few minutes when they arrived at the police station, when Brown complained the defendants told him they could take him to the police station as an alternative to remaining cuffed. *Stainback*, 569 F.3d at 769. But Brown declined, apparently because he was hoping that they would agree to use him as an informant, avoiding arrest and the revocation of his supervision.

A review of the officers' bodycam footage reveals the nature and tone of the colloquy between the officers and Brown. Brown was very talkative during the entire time he was handcuffed, and there was very little in his comments that should have led the officers to conclude he was in pain or distress rather than merely uncomfortable. Reading the words Brown said can yield a very different impression than hearing them and seeing his expression as documented on the officers' body cameras. Brown may have been peppering his statements with vulgarities, but his tone was much more cordial than his word choice may suggest. He was neither desperate nor emphatic.

Similarly, his comment about his football career being over could not be understood as suggesting any sort of permanent injury. Both in substance and in tone Brown was jesting; Brown was in his 40s and there was no hint that he had any NFL tryouts in his future.

Any reasonable police officer should recognize that four hours is a long time to remain handcuffed. Just as simply sitting in one position for that long would be expected to be uncomfortable, a person would expect to be uncomfortable or sore if he has his arms behind his back for four hours. But under the circumstances, knowing that discomfort was likely does not amount to knowing of a constitutional violation. Significant in this conclusion is that Garcia offered Brown an alternative to remaining handcuffed: they could be removed shortly if he wanted the officers to take him to the police station. Also significant is the officers' generally accommodating demeanor throughout the

interaction, including by allowing Brown to alleviate his discomfort by standing and stretching rather than remaining seated.

It is hard to say that, when faced with intermittent complaints of shoulder pain from someone who appeared pleasant and conversational—not appearing to be in serious pain—that the officers were constitutionally required to make any more accommodations than those they did (altering the handcuff fit, offering to relieve Brown of the cuffs by taking him to jail, and allowing Brown to be more comfortable by standing). And in borderline cases, it is especially difficult to say a constitutional right was clearly established. *Rooni*, 742 F.3d at 743.

Under these circumstances, a reasonable police officer in Garcia's and Nikolai's position would not know they were violating the Fourth Amendment's prohibition against unreasonable seizures. Therefore, Garcia and Nikolai are entitled to qualified immunity. Defendants' motion for summary judgment based on qualified immunity will be granted.

## 5. Conclusion

For the reasons set forth above,

**IT IS THEREFORE ORDERED** that Defendants' motion for summary judgment (ECF No. 23) as to defendants David Arvai and Michael Riemer is **granted**.

**IT IS FURTHER ORDERED** that Defendants' motion for summary judgment (ECF No. 23) as to defendants Juan Garcia and Jeffrey Nikolai is **granted**.

**IT IS FURTHER ORDERED** that Defendants' motion for summary judgment (ECF No. 23) as to defendant City of Racine is **dismissed as moot**.

The Clerk shell enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 15th day of January, 2025.

_William E. Duffin_
WILLIAM E. DUFFIN
U.S. Magistrate Judge